In this appeal, Mr. Pena-Gonzalez challenges the District Court's denial of his motion to suppress, and he also raises a challenge to his sentence. I'd like to begin my presentation today with the challenge to the motion to suppress. Mr. Pena-Gonzalez moved to suppress the evidence on the ground that the traffic stop of his Tahoe was unconstitutionally prolonged beyond the time that the initial traffic purpose of the stop had been concluded. The District Court denied the motion, holding that Officer Tamez had reasonable suspicion to extend the four factors, the presence of four pro-law enforcement stickers on the back of the Tahoe, the presence of four air fresheners in the Tahoe producing a strong fragrance, the presence of a Pancho Villa medallion and a St. Jude medallion on the key chain, and three rosaries hanging from the rearview mirror. On appeal, the— But you don't understand. If they had bumper stickers that said, all cops are bad, or questioned them for that reason, and if they have bumper stickers that say cops are good, then they can keep them for that, too. They got them, right? Well, yeah, I think it's like—I think Justice Marshall said in Socolow that it's a chameleon-like thing, that virtually anything is going to justify the presence of reasonable suspicion. The government here claims that the stop was prolonged constitutionally, first, by consent, and second, in the alternative, because there was reasonable suspicion at the time the traffic stop ended. And I'd like to address each one of those in turn, beginning with the consensual prolongation argument. As an initial matter, the District Court did not, in its written order denying the motion to suppress, rely on consent as a basis for finding the prolongation of the stop constitutional, and we submit that the Court should not affirm on that basis. But just briefly, if the Court does look at the issue, the Court should hold that the government did not meet its burden of showing that Mr. Peña-Gonzalez consented to the prolongation of the stop. And we believe that this case is— Any passenger can consent? They can consent to their own detention or to the prolongation of their detention, but they can't consent for someone else. Well, he didn't consent for someone else. He answered questions. I'm just asking you rhetorically, because I don't recall seeing the argument before about a passenger. I mean, obviously, Thomas had already questioned the driver, his wife, and then he said, I want to question the husband. So I presume he walks around the car and he questions the husband, right? That's correct. But we submit this case is like the Tenth Circuit decision in Guerrero-Espinosa, which we discussed at some length in the reply brief, and just as in that case, there was no evidence that Mr. Peña-Gonzalez knew that the traffic stop was over, because he remained in the car while Mrs. Peña-Gonzalez was at the back of the car, interacting with the officer. And just as in Guerrero-Espinosa, without evidence that he knew the traffic stop was over, her consent could not validate the continued detention of him. And it's a personal inquiry to each person who's detained. I'd like to turn now to the question of reasonable suspicion, which is the basis that the District Court relied on in its order. There's been a lot of focus, mostly in the briefs, and I take this as because of Judge Crane's order, a lot of focus primarily on the religious symbols, the law enforcement stickers, the air fresheners. What about the driver's inconsistent statements, saying, oh, no, we didn't buy a car, oh, yeah, we did buy a Chevy Impala, not knowing exactly which hotel they were staying at? It seems to me that's actually the most suspicious of all this activity. So why don't you address her inconsistent answers? Sure. And again, I would invite the Court to take a look at the videotape of the stop and the transcript of the videotape, which is in our record excerpts. If you look at all of this in context, I don't think it's really suspicious at all. I think it's a fairly typical encounter between a motorist who stopped for speeding and the police. What happened was, first, Officer Thomas said, well, I stopped you for speeding, and she says, well, my little girl needed to go to the bathroom. Officer Thomas thought that was suspicious, but I don't think it's suspicious to say something that you think might get you out of a ticket. People do that all the time. Then he said, where are you coming from? And she said, Houston, which, for all we know, is the truth. He also found it suspicious that they lived in Mission, but that their insurance said that they lived in Palmview. Well, Palmview is nothing but a separately incorporated suburb of Mission. How does this officer know that? Well, he lives in the area. I think he would be familiar with— Where was the stop? I thought it was— He lives in Cleberg County, and he also found it suspicious that they had gone to Houston the day before yesterday. Well, again, it's a long drive to Houston. I don't find it suspicious they would drive to Houston, be there for the day for the car auction, and then, especially since they have a small child, wait until the following day to drive back to Mission or Palmview. There's nothing in the record that they're only car auctions in Houston? No, but probably the biggest car auctions are in Houston because it's the biggest city in the region. What about, to me, the most suspicious thing? One was the hotel, but then the most suspicious comment was when she says, no, we didn't buy a car, and then, oh, yeah, we did, actually. We bought an Impala, which begs the question where that car is, if they're driving back in this SUV. Well, I believe the question was, actually, did you find anything? And she probably understood that, did you find anything to buy? And the answer is, they didn't buy anything. And then she corrects herself to say, well, he found something he was interested in, but he didn't buy it. And, again, if you look at the videotape, there's no extraordinary nervousness by Mrs. Peña-Gonzalez, and I don't find these answers inconsistent. She didn't know the exact name of the hotel, but she thought it was something like American Best Inn. And, indeed, there are two American Best Value Inn hotels on Highway 249, which is where she said that they had stayed. Well, how do those houses at Trooper know that, though? Well, I would— I've never heard of American Best Value. I've heard of a lot of them, but, I mean— Well, you just stay in the fancy places. Yeah, well, if Mr. Crooks can tell me what he thinks is reasonable and suspicious, I can tell him what I think is reasonable and suspicious. Very true. But, especially, I think what is significant is the fact that Mrs. Peña-Gonzalez doesn't speak English. I don't find— They were conducting the interrogation in Spanish, weren't they? Yes, they were, but the American Best Value Inn is an English term. I find it not strange that a person who doesn't speak English would not remember the name exactly. I think this was— There's certainly wholly innocent explanations for all of that. Maybe the most likely explanations for all that are innocent, but that the standard is just whether the officer could have reasonably been suspicious based on those things and— Well, and I think if you look at this Court's cases, for example, where this Court has found no reasonable suspicion in Macias and Jensen and Jones and Dorich, those statements were far more suspicious than I think what was going on here. And I do just want to briefly say about the religious items. I don't—I have never seen a case—the district court relied only on the religious items. It did not rely on Mrs. Peña-Gonzalez's statements. We don't have any findings about those statements, about whether the district court found her nervous or anything like that. All the district court relied on was the four religious things. The air fresheners. Well, and air fresheners. I'm sorry. The law enforcement stations. Correct. I'm sorry. All the symbols and the— Right. The visible— And this trooper testified without objection. I presume that he has 12 years of experience and he's a specialist in laundering and this kind of crime, right? Well, he did, but he also testified that in his view, and this is a quote, there's no unreasonable suspicion. And that's at record page 205. So I would suggest— So you think he was just doing this to harass some people. Is that it? No, not necessarily. I have no reason to doubt the sincerity of his belief, but whether it's sufficient for this court to ground a reasonable suspicion finding on is quite another matter. And as I said, I have not seen any case where a reasonable suspicion finding has been based solely on these sort of profile type things. And I think even if you add to the mix Mrs. Pena-Gonzalez's answers to the questions, they don't even come close to other statements that this court has still found not to constitute reasonable suspicion in the cases I named, like Macias. I think because the stop prolongation cannot be justified by consent, and because there was no consent at the moment that the traffic stop concluded, and the government conceded it concluded when Mrs. Pena-Gonzalez was handed back her papers and was told that she was only going to get a warning, Mr. Pena-Gonzalez's Fourth Amendment rights were violated, and that violation fatally tainted his consent to search the Tahoe. And I do note that at this point, if there was sufficient or reasonable suspicion to prolong the encounter, that the consent to search would be invalid. So I view that as a concession that the consent to search was not sufficiently attenuated from the antecedent constitutional violation. I would like to turn very briefly to the sentencing issue in this case. By its own admission, the government withheld a motion for the third level law for acceptance of responsibility under Guideline Section 3E1.1b because Mr. Pena-Gonzalez proceeded to a hearing on the motion to suppress, and the district court apparently found that to be an acceptable reason. However, the district court erred as a matter of law in so holding because simply proceeding to a suppression hearing is not ipso facto sufficient for the government to withhold its third level motion under 3E1.1b. And in fact, the record— What's your best authority for that? I would suggest that the best authority probably from this Court is United States v. Washington, which is mentioned in our response to the government's 28J letter, where the Court found that it was error to deny all three levels for simply proceeding to a suppression hearing where there were no disputed issues of fact but simply an application of law to essentially undisputed facts. I would also point out the record shows here that the government knew well in advance of the ultimate trial date that if Mr. Pena-Gonzalez lost his suppression motion, he would be entering a conditional plea. So the government knew it didn't have to prepare for trial, and in fact, there's no evidence of trial preparation in the record. We don't have any proposed jury instructions, no motions in limine. I mean, the guideline refers to efficiency, doesn't it? Well, I think it refers primarily to trial preparation. Efficiency may be a— But, I mean, the word efficient, trial preparation and efficiency, aren't they both in there? I believe the word efficiency is in there, but our point is simply that under this Court's case law, he should not be penalized for exercising his Fourth Amendment rights where he did not deny factual guilt or deny facts that were necessary to the suppression hearing but was merely contesting an issue of law. Will you please address whether that's under plain error review or whether it was properly preserved? Yes, Your Honor. Our position primarily is that it's not subject to plain error review because the district court raised it sua sponte by asking the government whether it was going to move for the third level off, to which the government said no way, and the district court said, oh, because we had the suppression hearing, and the government said yes. So the district court was aware of that. That gives the explanation for why the government did what it did, but the district court never ruled on the propriety of that because the defense lawyer never said that's an improper basis, right? Well, the district court implicitly ruled on it by denying the third level. I think if Judge Crane had thought that that was improper, he would have done something about it, but I think he accepted it— Well, on the other hand, yeah, but the defendant could have done something about it, too, once he denied it. Undoubtedly, more could have been done, but we believe it's preserved, and I would, in rebuttal, like to address why even on plain error we should prevail. Thank you. All right. Thank you. Okay. Ms. Alanis. Good morning. May it please the Court? Amy Alanis for the United States of America. Starting with the first issue, the suppression issue, reasonable suspicion is and has always been determined according to the totality of the circumstances. How can it be suspicious for a driver who's been stopped for, in this case, speeding, just to say, I had a child who needed to go to the restroom? Why is that suspicious? I always—don't they try to give a reason why they were driving too fast? They do, Judge Smith, and I'm not really relying on that particular statement. I think Officer Thomas's concern or why he thought that was a bit suspicious is because she was like right away, it was like before he could almost get anything out of his mouth, she was giving her excuse. Now, again, in the totality of the circumstances, I think that's pretty minor. Well, the other thing, it just seems to me, I'm always suspicious of these situations in which the government claims to have it both ways. The driver was too relaxed or the driver was too nervous or whatever it is. Whichever way it is, it's suspicious, and I'm particularly wondering about these stickers on the back of the car. Mr. Crooks has provided us, helpfully, with these pictures on the bench from the record. I know that in the Houston area, I think it's true almost everywhere, lots and lots of people have these stickers from the 100 Club that they pay for and they put on the back of their car that supposedly goes to help officers in personal situations and is obviously supportive of the police. So is that a suspicious circumstance that can be used to prolong a stop? Well, Judge, again, when you just pick out this one factor and look at it, no, a bumper sticker in and of itself is not going to be. But this occurred down in Kingsville on a known narcotics trafficking route. Officer Thomas testified that this is something that smugglers do. They do everything they can to appear law-abiding. And of course, he had not one, but he had four different ones. And it's kind of interesting when you do look at the picture of the back of the Tahoe. There's one over on the right side, but they're also kind of all clustered there on the left side, right where the officer would be pulling in behind and looking. So again, Judge, I understand your concern. And no one would ever say it's reasonable suspicion to pull somebody over because of one bumper sticker. But I think it's just one factor among many. Let me ask you a hypothetical along those lines. I know the traffic stop itself here isn't being challenged because she was going a couple miles over the speed limit. That's not being contested. But let's say she wasn't speeding, but the officer, as I think he was able to do from his car, he saw the law enforcement stickers, he saw the rosary beads, and he saw the air fresheners. Because I think that was all visible when he pulled up along the side still in his vehicle. Would that have given him reasonable suspicion to stop the car? I think it might. In this particular area. This is just south of Kingsville. Again, on Highway 77. Notorious money smuggling. Catholic supporters of law enforcement need to be warned down there. Pardon me? Catholic supporters of law enforcement are pretty much automatically suspect. You know, I don't think those bumper stickers are all that common down there. I see them a lot in Houston. But you know, again, it's just the totality of the circumstances. Don't we have to give some credit to the judge who is local? Exactly. And who is probably talking to both law enforcement and defense lawyers constantly when he's off the bench? Absolutely. And he grew up down there. He's very cognizant of the, for lack of a better word, the drug smuggling culture. I mean, they have certain . . . They live with them. Yes. Yes. I lived in McAllen for 21 years, so yes, it is kind of everywhere. And they do have their own culture. And another factor that Mr. Pena-Gonzalez would like this court to overlook is this officer's vast experience. He had been working there in Kingsville for 12 years, and he was an expert on criminal interdiction. And he's even a certified instructor. He goes around and teaches at DEA courses and other federal agencies about, you know, how to look for people who are smuggling contraband. And he's a local person also. So as this court and the Supreme Court has said, it's really important to let officers use their experience and knowledge and recognizing that they may see things that normal people don't. Well, you know, it's a question of how far this can be taken. As you well know, we have lots and lots of cases of drug and alien interdiction on Interstate 10 between Houston all the way through Louisiana. There are border patrol cars that are routinely stationed at Exit 8 in Louisiana. And the stops and the cases we see are because Interstate 10, 159 up to Houston, and then 10 going east all the way to Jacksonville is considered a drug corridor. So how far can it go? Can these bumper stickers be suspicious in Lake Charles, Louisiana, because that's a drug route? Judge, again, it's just the totality of the circumstances. I don't think anybody's ever going to be pulled over because they have one bumper sticker. And again, that's not why this vehicle was pulled over. It was pulled over because the driver committed a traffic offense. She wasn't pulled over because of her bumper stickers. Well, but we all know, and it's in the record in lots and lots of cases, not this one, all they have to do is tail a car long enough for it to wander across the center line or go one mile over the speed limit. You know exactly what I'm talking about. And that's the reason for a traffic stop. And the Supreme Court said that's okay because it's an objective test of whether they're committed a violation. Well, and as the Supreme Court recently noted in the Rodriguez case, one of the dissents said, you know, you can be arrested after the Lago Vista case. You can actually be arrested for a traffic stop. And, you know, that's, I mean, I understand your concern. There's always a concern about police going too far. But I think that's why we have this whole process to test the reasonableness of the police action. And I think the system works. And here I think when you look at the totality of all these circumstances, not just bumper And as Judge Costa noted, it just kept getting more and more suspicious as the conversation went on. And I also would urge the court to watch the video and note there are pauses, there are some ums, and, you know, and he says, you know, this is something that I look at when a person hesitates in relaying basic information about where were you, where have you been, where are you coming from, what did you do, where did you stay, it raises a red flag. Is it very unusual for the officer to separately question both the driver and the passenger in the car? I don't know how usual or unusual it was here, but he determined pretty early on that she was not the owner of the vehicle. And he believed that the owner of the vehicle, Pena, was there and that it was her husband and that he was in the car, too. Well, I thought it was pretty common, actually. Again, we've had a lot fewer of these cases than we used to, but where you see whether they gave inconsistent stories. Oh, of course. I think when her story is a little odd, a little bit off, he wants to talk to the owner of the vehicle and see what he has to say. And that's exactly what happened here. Summarize for us what the government's view is of the inconsistent stories that are suspicious. Oh, there are a number of them. Let me check my notes so I don't overlook anything. You have, of course, the indicators that he sees before he stops her. He asked her, do you live in Mission? Because that's what their proof of insurance says, Mission. He asked her, where do you live? Mission. But her proof of insurance says Palmview. And those are two different towns in the valley. They are close together. And just as a factual matter, Kingsville is a good hour and a half from Mission, Palmview. I don't know that a Kingsville officer would have necessarily known how close or how far away Palmview was from Mission. But the salient point there is that she never really responds and she kind of just, when you watch the video, she kind of just goes, you know, she gives this shrug. She doesn't have any explanation as to why those two answers are different. Then they have the conversation about the car options. And he asked her, well, did you find anything? Yes, an Impala. But no, we didn't buy it. And I think one of the most interesting answers is he says, how long did you spend there? One day. But then she says, no, we went the day before. And it turns out they stayed two nights. So she's kind of all over the place about how long they stayed. And, of course, she has the answer where she just doesn't really know the name of the hotel. She takes a stab at it. So that's all. And then, again, she's kind of shrugging and she's having some hesitation. You'll see that on other houses where she's, you know, really kind of having to think about these simple answers. And so that's the reasonable suspicion up to that point. And then. What about the package? That's all the inconsistent answers that the government's relying on. I think so. That's all I have here. Again. Tell us the detail about the hotel. About her husband. The hotel identification. Tell us in detail what the record shows on that. We don't know where they actually stayed. But she says something like best American. And then he tells the officer best Western, I believe is what he says. And that's in our response. You know, when the suppression motion was litigated or when the evidence was heard, you know, we go by what they say in their motion to suppress. And they basically didn't contest anything after the documents were handed back. The defense's position and the motion to suppress was, you know, that stop ended then. There was no more reasonable suspicion. And her consent to speak to her husband was invalid. And so that's kind of what we all focused on, including the judge. I don't understand why the driver has to give consent to the passenger being asked questions. I don't think the driver necessarily does. I don't think there's any. I don't think the law has said that a trooper can't ask questions of a passenger when he stops a car. I agree. I think he had a reasonable suspicion to go talk to the passenger anyway. But it's just, I guess, a little extra that she says, sure, I'm OK with that. But the government conceded once the insurance and license were given back to her that that ended the traffic stop purpose. So under the new Supreme Court case, and really under our prior case law, some other circuits had said differently. But then the issue is, was there additional reasonable suspicion at that point to continue the stop, including the questioning? Exactly. In fact, I believe the defense lawyer asked the officer, well, what if she had said, no, you can't talk to my husband? He answered, I believed I had reasonable suspicion to continue to stop. So regardless of her answer, he would have spoken to the husband. And I believe he said he would also have called for a K-9 unit because he believed he did have reasonable suspicion to detain her. What about the fact that Judge Crane did not rely on the driver's statements? His order just says, you know, the air fresheners, the rosaries, the St. Jude medal, the law enforcement stickers. He doesn't mention her comments. Well, I don't know what to say about that, but I think the facts are facts that we're relying on. I mean, just because he left it out of the order isn't necessarily dispositive, and this Court can affirm the decision on any basis shown in the record. And of course, well, I'll just, I'll leave it at that. Unless the Court has any more questions about the suppression issue, I'm going to turn just briefly to the second issue about the government's refusal to move for what I'm going to call here the third acceptance point. First, I hope, address whether it was preserved. Pardon me? You'll address first whether it was properly preserved. Absolutely, Judge. You know, when you look at the record on this, I mean, it was just, the judge was just kind of, you know, going through the PSR, and this was in the PSR, only a minus two. The government, you know, has not filed the motion, so there was no written objection to that. He did file other written objections to the PSR, but he didn't object to that. He never said a word during the sentencing, and this was just a brief reference by Judge Crane, just checking to make sure that it was really supposed to be a minus two for acceptance and not minus three. And the government said, no way. He says, oh, okay, because of the suppression. Right. And then everything moves on. There was no . . . The defendant said nothing. The defendant's counsel said nothing. Nothing. Never said a word about that. And so I submit a plain error applies here. Mr. Pena cites a couple of Tenth Circuit cases that I don't believe this court has ever adopted any such exception to the plain error rule. I couldn't find any other court that had ever adopted this rule. And that rule says that it applies only where there is an issue of pure fact, or I'm sorry, an issue of pure law where no facts are at issue at all. And I submit you have some factual issues here when you look at 3E1.1B, you know, whether the notice was timely, whether the government had to prepare for trial, where resources were allocated efficiently. So even if that rule applied in this court, which the government doesn't think it does, it just wouldn't apply to this case. So plain error. Does the government, either DOJ as a whole or the U.S. Attorney's Office in the case of the third point when a suppression motion has been filed, or is it case by case? It is just case by case. We don't have a written policy. I did kind of ask around, and generally the policy is you don't if you have a full-blown suppression hearing. But there's no policy because there could be a case where, you know, maybe it's just something real quick and easy. Maybe it's done very early on in the case. You know, it's just one of those things that's left up to the discretion of the prosecutor based on the facts of this particular case. In nearly 20 years of the guidelines, it is rather odd that I've never seen an appeal about this. It is interesting. There was one called Delaurier, but we don't know much about the facts of that case. It does seem to me, I mean, putting the legal issue aside, just we're talking about one point, especially in a system where the guidelines aren't even mandatory anymore. I mean, just from the big picture, I mean, and allocating resources. I mean, now you're here in New Orleans having to defend this. You had to write a brief on it all over one point. I don't know. It just seems kind of silly to me, but that doesn't affect the legal issue. I would agree, too. And as to the third prong of plain error, you know, I've cited the Garcia-Castillo case in my brief for the proposition that even if you wrongly were denied, your third point where your sentence is within the guideline range that would have resulted from deducting that third point, you haven't shown any harm to your sub-centralized. So we also have that going on here. And I submit, as I've argued in my brief, and I won't belabor this, but there's nothing in the language of the one-sentence amendment, that was Amendment 775, that changes anything with respect to pretrial matters like a motion to suppress. So we just don't believe that amendment changed anything about the government's discretion. And finally, I'd just like to point you to the case that I cited in my 28J brief, which is Castillo. And that one was really about something else, actually. It was a case where they were contesting perhaps frivolously the amount of loss in a fraud case. But the most interesting thing about that case was the discussion of the history of this amendment. And it talks about the Protect Act, which was enacted approximately 2003, which for the first time, you know, said that it changed the guideline to say the government has to file a motion for the defendant to get this third point. And they make the point that basically, and also that you mentioned that how the Protect Act contains commentary that basically is aimed at any type of limitation on the government's discretion to do so. And that basically a broad reading of Amendment 775 protects that discretion as well as the district court's discretion. So I think that's relevant here. I think a broad reading of the amendment should be applied. And it simply doesn't apply to motions to suppress. And unless the Court has any other questions? No, ma'am. We ask for affirmance. Thank you. Thank you. Turning to the last matter the government just discussed, I promised that I would go briefly through the plain error analysis for the third point in case the Court doesn't agree that the error is preserved. We submit that especially under this Court's decision in the United States v. Washington, but also cases, it was an error of law to deny the third or to withhold the third point simply because the defendant went to a suppression hearing. And the marker has always been, as Washington makes clear, did you dispute facts? And Mr. Pena-Gonzalez didn't do that here. And the recent decision in Castillo doesn't change that because we submit that his challenge to the stop was in good faith. This error was also plain, again, because of Washington and other cases like that. Washington dates back to 2003. It's been the law in this circuit that merely going to a suppression hearing in and of itself does not entitle the government to withhold acceptance. This affected Mr. Pena- That's the whole shebang, though, right? That's not a one-level decrease. That's entire acceptance. Well, Washington dealt with all three points. Right. Right. And then it affected his substantial rights because even though it's true there was an overlap in the guideline range, in other words, the 41-month sentence could have been imposed even with the one-level reduction, we have additional evidence here that the guidelines made a difference in this case because with respect to another objection that the defense made, Judge Crane said, well, I don't think you're right about the law, but if the Fifth Circuit says you are, then they should reverse. And that shows that Judge Crane was focused on the guidelines and was not sentencing irrespective of the guidelines. What do you do about the overlap and the fact that that automatically, I mean, some of our cases would indicate that that's a strong indicator that the defendant can't prove that it's a harmful error? Well, I think what the court's cases say is that the overlap will preclude it unless there's additional evidence. That's what I'm asking you. And the additional evidence is what I just said about Judge Crane making that remark with respect to the other guideline objection, which showed that he was focused on the guidelines. Yeah, but no, I'm sorry. Maybe I missed it. The fact that both of them, but this is right in the middle of both guideline ranges, right? It's at the bottom of one of them, but it's certainly not in, it's in the middle of the other one. That's correct. And what I would point out is the objection that defense counsel made, the 41-month sentence would also have been in the guideline range that would have obtained had Judge Crane granted that objection as well. But Judge Crane didn't say, I would give the same sentence anyway with respect to that. He said the court should reverse. And we believe that's additional evidence that it did affect his substantial rights. And finally, with respect to the fourth prong, we believe that it seriously affected the fairness, integrity, and public reputation of judicial proceedings because it's penalizing an exercise of Mr. Pena-Gonzalez's Fourth Amendment rights. And this court highlighted that the court should be very wary of doing that, again, in the United States versus Washington case. Well, but forcing the government to go to a full trial would meet that test too, right, in a case where the government was forced to go to trial? That's true, but the guidelines specifically provide for the level to be withheld if you go to trial. And they don't really speak so clearly as to this. And we have the Washington case, which says that we're going to draw the line where you can test factual guilt. I do want to just make a couple of comments about the officer's experience. There's no question that the officer's experience is a relevant factor in the reasonable suspicion analysis. But as the Tenth Circuit has said, the deference owed to the officer's judgment is not unlimited. And I would just highlight that I have found no case, and I don't believe the government has cited any case, where reasonable suspicion has been found on facts as skimpy as in this case. And therefore, we would urge the court to reverse the judgment below. Thank you. Thank you.